We will hear argument this morning in Case 25-332, Trump v. Slaughter. General Sauer. Mr. Chief Justice, and may it please the Court. In SELA law, this Court held that the President's power to remove, and thus supervise, those who wield executive power on his behalf follows from the text of Article II, was settled by the First Congress, and has been confirmed by precedent, including at least nine decisions of this Court from Ex parte Henan through Trump v. United States. Humphrey's executor stands as an indefensible outlier from that line of authority. Its holding that federal agencies can exercise quasi-legislative and quasi-judicial powers that form no part of the executive power has not withstood the test of time. That holding was gutted and refurbished in Morrison, but this Court correctly rejected the refurbished version as providing an amorphous test with no limiting principle. Respondent now proposes a third update to Humphrey's, which this Court has already rejected as making no logical or constitutional sense. Humphrey's must be overruled. It has become a decaying husk with bold and particularly dangerous pretensions. It was grievously wrong when decided, and cases from Morrison to Trump have thoroughly eroded its foundations. The Court has repudiated Humphrey's reasoning and confined it to its facts, but it continues to generate confusion in the lower courts, and it continues to tempt Congress to erect, at the heart of our government, a headless fourth branch, insulated from political accountability and democratic control. As Justice Thomas wrote in Selah Law, Humphrey's poses a direct threat to our constitutional structure, and as a result, the liberty of the American people. And, as Selah Law held, the modern expansion of the federal bureaucracy sharpens the Court's duty to ensure that the executive branch is overseen by a president accountable to the people. I welcome the Court's questions. General Sauer, could you give us one example of a permissible restriction on the authority to remove a principal officer? We don't believe there are permissible restrictions on principal officers of the United States who exercise the executive power. Now, there may be separate issues relating to historical pedigrees. In this case, in a multi-body agency such as the FTC, is there any permissible restriction? No. This Court, against the United States, held that the president's power to remove officers wielding the executive power is conclusive and preclusive. How far do you go with that? Can it be arbitrary, completely arbitrary? It is conclusive and preclusive, so any review of arguably bad reasons for the president to remove an executive officer would be subject to the political process. It would not be subject to judicial review, and certainly not subject to statutes regulating that. I think there are a lot of agencies in the federal government where it's hard to parse whether it's an executive function they're engaged in or a legislative function. We obviously have the Perlmutter case that we're holding where you're dealing with the Library of Congress, which half of it's a library, half of it's things like the copyright. What are we supposed to do with that, if you're correct? Well, Mr. Chief Justice, in free enterprise, from this Court, I think very aptly stated that the vast and varied nature of the federal government is a reason not to make general pronouncements on issues that haven't been briefed and argued. There are certainly situations where there are tough line-drawing problems. You raised the Perlmutter case as one that may raise arguments of that nature, but by and large, the sort of insight that goes from Morrison to FCC against Arlington and to seal law recognizes that these multi-member agencies that are exercising what this Court has repeatedly recognized as quintessential executive powers, like the FTC, rulemaking, adjudication, investigation, seeking a civil enforcement power, litigation, seeking civil enforcement powers, civil enforcement remedies, and so forth, those are not close cases. Yeah, I mean, I appreciate your point about not deciding cases that aren't before us, and I meant the Perlmutter case as an example, but I'm not sure you answered the question. Is this a severance issue? Do we say the agency is okay so long as half of it survives in one branch and half in the other, and if so, who gets to decide that? For the vast majority of these agencies, I think you see a lot of point out there's maybe about two dozen executive agencies that are multi-member structure and have removal authority. I think the logic of this Court adopted it for severability in free enterprise fund and seal law, and Collins indicates that in the vast majority of cases, there would be an excision just of the removal authority. Now, if there are agencies that kind of straddle the line between legislative and executive, that might present harder severability problems. Why is that severability the issue? Meaning, if you think they're wielding power that is inappropriate, why don't we sever that power? I think those very arguments... Instead of the removal power. Well, for example, consider an agency like the FTC, which is before the Court, virtually all of its powers, I can't think of any power that actually... But most of those powers were part of Humphreys. This Court, even in seal law, and all of the cases you've mentioned since, have said that Humphreys is controlling law. You're asking us to overturn a case that has been around for nearly 100 years, correct? 90 years, I believe. 90 years. What other cases have we overturned that have had a pedigree of 100 years? Penoyer against Neff was overruled by Schaefer against Heitner on its 100th birthday. That was an economic case. What other case? For example, Erie overruled a 50 Tyson 96 years later. But which other case has fundamentally altered the structure of government? For over 100 years, actually since 1887, we've had multi-member boards, and that's the entire government structure. The distortion of the structure of government, respectfully, that Humphrey... Aren't you asking us to distort it a different way? Neither the king, nor parliament, nor prime ministers, England at the time of the founding, ever had an unqualified removal power. You're asking us to say that at a time, the founding, when the Constitution doesn't speak about this at all, where there was robust debate over this issue among legal scholars at the time, that we ourselves have said repeatedly in Humphreys and other cases, Wiener, even in Myers, that those cases you mentioned did not establish this absolute power of the president. You're asking us to destroy the structure of government and to take away from Congress its ability to protect its idea that the government is better structured with some agencies that are independent. I think we're asking the court to return to the dominant line of authority that started in 1839 when this court said that it's a settled and well-understood construction of the Constitution that the president alone can remove executive officials. That was reaffirmed in Parsons, for example, where it described it as settled beyond the power of alteration. Again, in Shurtleff, similar language. Myers says the same thing. Free Enterprise Fund. Collins, seal the law, trump against the United States. And even Humphreys' executor itself paid lip service to this principle. Humphreys described this power as unrestricted and illimitable. And in order to get out of that rule, which the court has recognized in those nine decisions, it's going back to 1789. You still haven't answered my question. Where else have we so fundamentally altered the structure of government? I think the fundamental alteration of the structure of government was ushered in by Humphreys, and then Congress kind of took Humphreys and ran with it in the building of the monastery administrative state and the proliferation of independent agencies that are insulated. Independent agencies have been around since the founding. The Sinking Fund, the War Commission. We've had independent agencies throughout our history. So this is not a modern contrivance. We disagree with that. As in our brief, we disagree that characterization of those agencies, the Sinking Fund Commission, for example, was composed of three officers who were cabinet secretaries. We have an amethyst that shows us how the president's will could have been thwarted by that structure. We have an amethyst brief that shows us how the president's will, by that structure, could have been thwarted. These kinds of historical examples, I think, have been considered in this court's cases from Friend of Rice Fund and Field Law and so forth. What do we do with Morrison and Weiner and Perkins? Well, Morrison, for example, I think, is a really critical precedent here because what Morrison did is it repudiated the entire logic that supported the holding of Humphrey's executor. It repudiated correctly the idea that there are these quasi-judicial and quasi-legislative powers that are outside the executive power and they're wandering around the executive branch. You answered the Chief Justice by saying that maybe we just need to look at each agency individually. So we can't leave that area. By the way, your logic, you're putting at risk. By this, you're saying there's uncertainty. I think the uncertainty in the lower courts was not over Humphrey's executor. It has been over the court's most recent decisions, not because of Humphrey's executor. But you're putting at risk the independence of the tax court, of the federal claims court, Article I courts. You're putting at risk the civil service. I don't see how your logic could be limited. As with non-Article III courts, we haven't challenged the removal restriction as the non-Article III court has. Not yet. We recognize that there are some line-drawing issues as to those that came up in cases like Freitag and Ortiz. Again, those aren't presented here. Those aren't briefed here. There's a difference, I suppose, between Humphrey's and Wiener, right, in terms of whether you overrule one or overrule the other, in terms of the consequences with respect to modern agencies. The war commission in Wiener, if you think that that's more like something like the Court of Appeals or the Armed Forces or the tax court or all those others, it strikes me that Humphrey's may be the issue, and that doesn't mean that Wiener falls with it or that the other agencies fall with it as well. The piece that we have a footnote about this, and I believe footnote one, and we invite the court to overrule Wiener as well. Part of Wiener, we think, has been overruled by Braidwood, which is Wiener interpreted, found a removal restriction that was not in the plain text of the statute, and that contradicts case law from Shurtleff until Braidwood. The other aspect of Wiener that we think is destructive is the phrase, the philosophy of Humphrey's executor. That philosophy of Humphrey's executor seems to have a very firm hold on Congress and a firm hold on the lower courts, and that's why there's been a proliferation of litigation. Now, there's one thing about, and I'll be brief, there's one thing about philosophy and there's another thing about holdings. Certainly the holdings of Humphrey's executor doesn't necessarily support Wiener to its fullest extent. We agree with that. General Sauer, can I ask you about the Federal Reserve? The other side says that your position would undermine the independence of the Federal Reserve, and they have concerns about that, and I share those concerns. So how would you distinguish the Federal Reserve from agencies such as the Federal Trade Commission? We recognize and acknowledge what this court said in the Wilcox-Harris State Opinion, which is that the Federal Reserve is a quasi-private, uniquely structured embassy that follows a distinct historical tradition of the First and Second Banks of the United States. There's two adjectives there, adjective and adverb, unique and distinct. The Federal Reserve has been described as sui generis. Any issues of removal restrictions as a member of the Federal Reserve would raise their own set of unique, distinct issues, as this court said in Wilcox-Harris. We have not challenged those, either in this case or any other case, and so it's not before the court. But I think the question, General, did you want to? I think the question that these questions go to, right, is if you take your logic at face value, it seems to include a great many things. If I were to say, you know, your fundamental proposition in your briefs is that the Veston Clause, how many times do you say in your brief gives the executive power all of it to the president? And so if you believe that, the fact that you can say, well, this has a history and that has a tradition doesn't much go to the rationale that you are asking this court to accept. So once you're down this road, it's a little bit hard to see how you stop. And I think that that's one question. I mean, you know, there's another question about whether you should start at all. But one question is if you accept that proposition, which is the fundamental proposition of your brief, it does not seem as though there's a stopping point. Yeah, I think it's a proposition of our brief, but those are obviously quotes from these courts' opinions. So it isn't that we have gone down this road. I think the court has been down this road. The country has been down this road since the decision of 1789. Again, ex parte, Hennon describes this as settled beyond doubt. Again, Parsons, which anticipates all the analysis of Myers, says the very same thing. This is beyond question that there's this removal power. And keep in mind, that's 1897. It's well after the bitter integration disputes about the Tenure of Office Act. It's after Congress started engaging this proliferation of restrictions on the removal of inferior officers. Well, let me ask you how you would justify and how you would justify consistent with the proposition that all executive power is vested in the president. Let's start with Article I courts. How would you justify keeping those courts? Well, those courts, the determination have to be made on a court by court basis, so to speak, as to whether or not they're engaging in the executive power. There are tough, there may be tough mind drawing questions there. I mean, I thought that one of the things that we said, again, in many, many cases is that even though they're engaging in adjudicative functions, they have to be executive by their nature. There's a dispute about this. I think basically lurking beneath the surface in the discussions in Ortiz, if they are indeed exercising executive functions, then the logic of this logic would apply. Go ahead, please. Well, I'll go. Is it a possibility, let's say you have an agency that is, I don't know, pick a number, 85% is judicial. Some of the judicial entities that have been talked about in the briefs, and a smaller percentage is some executive function that they do, whether it's issuing rules or whatever. Is there a principle that you would sever out the smaller little tail on the dog and allow the judicial functions to go on? Quite possibly, that would be, I think, a unique severability question that would be distinct from the merit. If there was an agency that straddles the line between two branches, that may raise a different severability question. But for the mine run of these multi-member executive agencies, they're clearly exercising executive power. They're doing stuff that what the NLRB does, that the MSPB does, that the SEC does. So, you are here saying the NLRB goes down, the MSPB goes down, notwithstanding that they do all their work, or almost all their work, in judicial-type proceedings. I wouldn't say goes down. I would say they were restored to democratic accountability and a constitutional structure, but we have contended on... The current versions of those agencies goes down. We have challenged those in this court, NLRB, MSPB, and there are others, this court in state of law. I mean, there's various lists out there. How about inferior officers? We haven't challenged any restrictions on inferior officers. Why wouldn't that also have to go? That would certainly... Restrictions on inferior officers in the United States would be problematic because, of course, Myers involved an inferior officer.  The logic of Myers extends to inferior officers. And obviously, there are all kinds of inferior officers wielding executive power all over the place, yeah? There are many. Yeah, so it seems as though executive officers... How about employees? Again, we haven't challenged the restrictions on... I know you haven't challenged it. It's really... The question is, where does this lead? What does it take you to, given what your primary rationale is? Employees are wielding executive power all over the place, and yet we've had civil service laws that give them substantial protection from removal for over a century. How about those? Well, we do not challenge... I know what you don't challenge. You're missing the point. Well, then let me point the court to, if I could, to 7511B of the civil service laws, the CSRA, that we cite in our brief. That is a series of exceptions in it that provides no judicial relief at all to classes of employees, they're called. Now, some of those employees are clearly officers. Some aren't. But, for example, presidentially appointed officers, Senate-confirmed officials, those who exercise substantial policymaking or have confidential responsibilities. Members of the CIA, employees of the CIA and the Foreign Service. So there's already been a... The political branches have, in many ways, already addressed issues with employees. Now, this court, obviously, dealt with the employee issue in Lucia, and there was a dispute about that, various proposed lines between employee and inferior officer. Well, can I ask you the same question, or maybe just a very similar question? In a different way, you've been asked about a number of different agencies. A few of them are likely to come before us in the near future because of actions that the president has taken. Others, as you point out, have not been featured in litigation, of which I'm aware up to this point. So, suppose we were to decide this case in your favor without reaching some of the agencies that have been mentioned, like the Tax Court and the Claims Court and the Court of Appeals for the Armed Forces, to name three. Suppose we were to decide the case in your favor, but we did not want to address those other agencies on what ground, one way or the other, to express a view that would affect those agencies either, as I said, one way or the other on what would you propose that we say, so as to reserve decision on those agencies that may not come before us in the near future or perhaps at any time in the future? I would, I think, use the language that the court used in Free Enterprise Fund when it said we do not decide the status of lesser functionaries. It pointed out that the Senate in that case and itself pointed out that the federal bureaucracy is vast, and it said we don't want to decide, given the size and variety of the federal government, that discourages general pronouncements on matters that are not briefed and argued. Now, as to, for example, non-Article III courts, I'm not even aware of litigation about those removal restrictions for any of those. But the idea is that our logic has consequences. Once you use a particular kind of argument to justify one thing, you can't turn your back on that kind of argument if it also justifies another thing in the exact same way. And so, you know, putting a footnote in an opinion saying we don't decide X, Y, and Z because it's not before us doesn't do much good if the entire logic of the opinion drives you there. I'm not sure that's true when it comes to non-Article III courts because there the question would be what are they doing? Is it judicial power or executive power? That's a totally different set of questions. Those are hard questions. But I think Justice Kagan's point is that you're asking us to ask that question. And so we have to understand you're asking us to ask the question with respect to each agency, what are they doing? That's the necessary result of the argument that you're making in this case. And I guess my point is one way to avoid these difficult line drawing problems would be to let Congress decide. I mean, I sort of thought that we have Article I, which I think you agree gives Congress some authority to set up these agencies, to determine their structure, to create the offices that we're talking about. So it seems to me that that greater power, we should at least think about whether it should include the power to determine the term of office, the extent to which people can be removed. And I appreciate that Article II has some language in it that you're pointing to. But as Justice Sotomayor pointed out, the Constitution does not speak specifically to removal. You're asking us to infer this based on the Constitution's structure. And I don't know why we'd make that inference when the power to create agencies and set everything up lies with Congress. I agree very much of what you said, and so did James Madison. So he made the point in the decision of 1789 that Congress has authority to create the office and set its emoluments and structure that office. But once Congress has done that, its power there stops. Is that because of your democratic accountability? I'm trying to understand why you think that Congress is somehow less democratically accountable for the way in which it constructs these agencies and determines the term of office of the officers. You seem to think that there's something about the president that requires him to control everything as a matter of democratic accountability, when on the other side, we like these particular agencies and officers to be independent of presidential control for the good of the people. We're exercising our Article 1 authority to protect the people by creating this independent structure. And I don't understand why it is that the thought that the president gets to control everything can outweigh Congress's clear authority and duty to protect the people in this way. Congress has a broad authority in structuring the federal government, but it lacks authority to do is to create these headless agencies, agencies who have no boss and are not answerable to the voters. Why? Why? Why does it lack the Constitution does not say that Congress cannot create an independent agency. So what is it about your argument that requires us to reach that result? We disagree with that. We think the text of the Constitution confers the executive power, all of it on the president as Madison argued compellingly in the decision of 1789, the power to remove is an aspect of the executive power. Further, the text of the Constitution includes the take care clause, the take care clauses, the court has said virtually every time it's discussed this, the text of the Constitution includes the necessary and proper clause, which gives Congress the authority to determine, set up, et cetera, these agencies to protect the interests of the people. So we have a conflict, I guess. And I'm just wondering why the president's interests in the way that you described them when you can answer the question is not proper under the necessary and proper clause for Congress to peel away executive power from the president and give it to someone who's not answerable to the voters. This is Thomas Justice legal. Let me follow up on two things that have come up thus far. It certainly is an interesting argument. It's an interesting constitutional argument. It's an interesting political science argument about the advantages and disadvantages of allowing Congress to impose removal restrictions on executive branch officers. When would you say the court crossed that bridge? And what have we said about that bridge in recent decisions? Recently, the court, and in many decisions, the court has pointed out that the framers of the Constitution were not trying to prioritize efficiency or convenience. They were deliberately creating a separation of powers where the branches would check each other. And that's why the court should have sharpened rather than blunted review of encroachments by Congress that involve peeling away executive power. Well, I mean, there's an argument that the Constitution doesn't say anything about the president's removal authority. And therefore, Congress should have free reign on that question. When did the court cross that bridge? I think the court, if you're saying cross that bridge, I mean, when did the court adopt that view? When did the court say that, no, Congress doesn't have plenary power to impose removal restrictions on executive branch officers? No later than ex parte Hennon in 1839, when the court said that, referring to the decision of 1789, that this is the settled and well understood construction of the Constitution that the president alone has the removal power. How about Myers? Myers was also very clear on that in 1926. In fact, Humphrey's executor itself paid lip service to it, even though its heart was far from it. It's been suggested that if we were to rule in your favor about the Federal Trade Commission, put aside these other agencies, just about the Federal Trade Commission, which is the issue that's before us, the entire structure of the government would fall. You want to take a minute to address that? The court in, I think, Free Enterprise Plotter Seal Law talked about these kind of predictions of doom and the sky did not fall when the removal restrictions were removed from the CPSC. And the PCAOB. So also, if the FTC, the MSPB, the NLRB are made subject to political process and the political discipline of being accountable to the president, the sky will not fall. In fact, our entire government will move towards accountability to the people. Thank you. Justice Sotomayor? Counsel Myers, which you rely on, was signed by a number of judges, and one of them was Justice Southerland, and he was the author of Humphrey's executor. So four out of the nine justices who signed on to Myers signed on to Humphrey's. So you're thinking, or you're arguing, that the reasoning of the more current justices on this court have more purchase than the views of renowned jurists like Holmes and Dice, who dissented in Myers, of people like Justice Story, who disagreed with this proposition. You're suggesting that we have a better view than either Congress or all of those previous justices about what absolute executive power means. That's basically your argument. All those justices in the past have been wrong, and the current ones are right, or at least the current ones of the sheet of the law majority. I'd say two things in response to that. I think the court was correct in the following decisions. Ex parte Hennon, Parsons, Shurtleff, Myers. Those all involve different and distinguishable situations. Now, with respect to the one component of government that you're not speaking about, when the FTC was created, as has been the case with most of these independent agencies like the Federal Reserve, particularly there, but not that much lesser with the FTC, Congress emphasized the importance of independency and the prestige that that independence would give to the decisions of agencies who are going to subject the public to rules and regulations of which there might be burdens. That independence is being taken out or undercut completely. Why are you so sure that Congress would have preferred to have the independence narrowed than not to have the agency at all? Some of my colleagues have suggested in prior cases that we shouldn't be engaged in the severability actions at all, but here you are arguing that, no, we should be doing that. Are you going to be consistent? The prestige, I would say two things in response to that. The prestige of independency is not a constitutional value. The constitutional value is the separation of powers and the vesting of all the executive power in the presence. According to the laws that Congress makes, and that's the point Justice Jackson was emphasizing. What you're saying is the president can do more than what the law permits. I think I would repeat what I said before. There's a strong line of precedent recognizing that the text and structure of the Constitution confer on the president the exclusive and illimitable power to remove executive officers, and as a result of that, Humphrey should be overruled. Justice Kagan? General, would you agree with me, and I hope you will agree with me because this seems to be the one thing on which everybody can agree, that if there's one thing we know about the founders, it's that they wanted powers separated. They wanted the executive, the legislative, the judicial. They didn't want them all in one place. They wanted them separated across the government, across the different branches. Easy enough to agree with, right? I agree with an important caveat that the court said in Sela Law that the one exception to all this division was the presidency itself where the framers consciously adopted a unified and energetic executive. That's not a caveat. Actually, that's like the not X to my X, you know, because what I was saying was, and maybe you knew where this was going, so you had to have this caveat, which is really a fundamental contradiction, but the idea is that the president was supposed to do the executing, but he wasn't supposed to do the legislating, and he wasn't supposed to do the judging. And here's my next proposition, which I think you have to agree with because we just look around the government, and it's obviously true. Some people think it's a real distortion from what the founders thought, but what you think of as executive branch agencies, including independent agencies, right, they do a lot of legislating, and they do a lot of judging. And you listed it a bunch of times. You said, this is obviously executive power. Why is it obviously executive power? Because they're doing a lot of rulemaking, and they're doing a lot of adjudications leading to enforcement. And those are, although we've said that this is executive power in some sense, but they're legislative functions. That's what rulemaking is. They're adjudicative functions. And isn't it problematic, given what we know about the founders' vision, that what this is going to amount to at the end of the day is putting not only all executive power in the president, but an incredible amount of legislative slash rulemaking power and judging in the president's hands? I disagree. I got off the, I started disagreeing very early in that question, and I think I can pinpoint it this way. The mere fact that this court held, I think every justice agreed in FCC against Arlington has been reassorted, and it was the vision of Morrison. It was recognized in Morrison. It was reasserted again in CLL. The mere fact that things that some of these agencies do have the form of rulemaking or adjudication does not make that legislating or judging for constitutional purposes. That is execution. Yeah, but we can all admit that for, what do you want to call it, for constitutional purposes, that in a real world kind of way, that's what they're doing. Now, some people think that we should never have gone down that road, but that's what we're doing. So let me put the proposition in a sort of different way. Here's been the bargain over the last century, and I think it has been a bargain. Congress has given these agencies a lot, a lot of work to do that is not traditionally executive work, that is more along the lines of make rules when we issue broad delegations and do lots of adjudications that set the rules for industries and entire bodies of governance, right? And they've given all of that power to these agencies, largely with it in mind that the but that indeed Congress has a great deal of influence over them too. And if you take away a half of this bargain, you end up with just massive, uncontrolled, unchecked power in the hands of the president. And it's really hard to affect both sides of this bargain because it's already been done. So the result of what you want is that the president is going to have massive, unchecked, uncontrolled power, not only to do traditional execution, but to make law through legislative and adjudicative frameworks. The president is going to have all the executive power, which is what the Constitution dictates. And the way you framed it there, I think makes the separation of powers problems in the alternative view here even worse. Because you have just described these rule makings and adjudications as really judging and legislating. If they really were that, which this court has unanimously said they must not be, they cannot be. But if they were that, then Congress is not just affecting the executives, it's creating junior varsity legislatures, which would be unconstitutional under Justice Scalia's defense and mistrata. It's peeling away adjudicative authority, the judicial power from Article III court. I understand that as a formal argument, and obviously formal arguments play a significant role in this area. But they shouldn't blind us to the real world realities of what our decisions do. And the real world reality of this one is that when you put all of these agencies under complete presidential control, given what Congress has already done and will not be able to take back with respect to the powers that have been delegated to the agencies, what you are left with is a president that maybe, you know, your first sentence to me, this is the kind of president you want, but a president with control over everything, including over much of the lawmaking that happens in this country. You have control over the executive branch, which he must and does have under our Constitution. And again, if that's really legislating, then it's a separate constitutional problem that the legislative power has also been taken away from Congress. Now, this court has not adopted that in a series of decisions, including Morrison, including FTC against Arlington, including Steele Law. The court has correctly recognized that all this stuff that agencies like the FTC is doing is an exercise of the executive power. That is fundamental to our separation of powers, which is the bastion of individual liberty in our constitutional structure. Thank you, General. Justice Gorsuch? General, let me suggest to you that perhaps Congress has delegated some legislative power to these agencies. Let's just hypothesize that. And let's hypothesize, too, that this court has taken a hands-off approach to that problem through something called the intelligible principle doctrine, which has grown increasingly toothless with time. Is the answer perhaps to reinvigorate the intelligible principle doctrine and recognize that Congress cannot delegate its legislative authority? Is the water warm, General? Sorry, what was the last? I couldn't hear the last bit. Is the water warm? Is the water warm? Suffice to say, let me say one thing in response to that. It is much easier to cure. Obviously, members of this court have debated the scope of the non-delegation doctrine. The challenge of finding the right standard there is something we've discussed in the past. Here, though, this wolf comes as a wolf, right? I mean, the restriction on executive power is right there in the statute. It's easy to remedy by excising or removing restriction. There are a lot of wolves around here, General. One thing our framers knew is that every political actor seeks to enhance its own power. We all know that to be true from our own experiences. And this court, as part of this bargain, has allowed these agencies to exercise both executive and legislative. Justice Sutherland, whose name hasn't been invoked around here in quite a while, his language about quasi-legislative and quasi-judicial and quasi-this powers. And this court has allowed that for a very long time. But if we're not going to allow it any longer, I take the point. I take the point that this has allowed a bargain where a lot of legislative power has moved into these agencies. But if they're not going to be controlled by the president, it seems to me all the more imperative to do something about it. I agree with that. And I can't address all the wolves in the world, but this wolf, when it comes to constitutional structure, is Fenris, the most dangerous wolf in the history of Norse mythology. And let me ask you about the judicial power. To the extent we're worried about the tax court or the court of claims, maybe, despite what people think, maybe some of them might be. I don't know. Maybe they're Article III courts and the removal restrictions are impermissible. Thoughts? There definitely could be arguments for that. I'm not taking a position on the validity or non-validity of any of those which are not presented here. But certainly commentators have argued that things like the federal magistrate judges and the bankruptcy courts seem to be real adjuncts to Article III courts and the argument might be made of that nature. There are line-drawing problems there. We haven't addressed them here. I don't have the federal government's concerted answer to that. But certainly, those line-drawing problems would go to whether what is going on is judicial power or executive power. And it is executive power. The adjudication of private rights is different, we have said, than the adjudication of public rights. And again, yes, those would implicate all those line-drawing problems. Justice Kavanaugh? Response to Justice Sotomayor's question. You have Taft and Scalia, right? Not too shabby. I think those are outstanding jurists, and with respect to Justice Scalia in particular, one of the greatest jurists in the history of the court. I thought your two exceptions that you had a lot of questions about, but I thought the two exceptions, the categories, were one, the Federal Reserve, based on history and tradition and function, and the other were the non-Article III courts, which starts in  Marbury itself discusses this. Taft discusses Marbury at length in Myers on this exact point of non-Article III courts being different. Taft leaves that open, right, in Myers. And so for a court of federal claims, tax court, the D.C. local courts, you mentioned this at page 23 of your brief, it would seem to me that Marbury itself says that is a line that distinguishes the non-Article III courts from the position that you're taking here. I know you may not agree with that, but is that a principled, sensible line we could draw? Certainly it is something that a court could look at. I don't want to take a position on them. To be clear, I am not taking a position on whether that line is valid, but certainly there are arguments that could be made and debated in an appropriate case about where those lines should be drawn, and you do, I think, correctly reference both Myers and Marbury itself as teeing up some of those issues. There's been debate about Marbury. Was that about D.C. or was that about judicial office? But I read it to be some of both, so for what that's worth. Why did no president challenge this structure from 1935 to 2025? We've had a lot of presidents who've had very strong views of Article II, yet for 90 years it stood not directly challenged. Why do you think that is? It may be a speculative to answer that. One reason might be that presidents are fairly comfortable with taking away tough political decisions, so as the court has said in multiple cases, I believe one president cannot bind the hands of its successors, and the president, there's a kind of responsibility that goes to the authority here of the president, sometimes may have a political incentive to allow tough decisions to be outsourced, so to speak, to agencies that he doesn't have direct control over. However, our constitutional structure dictates that the president cannot do so. He cannot bind the hands of its successors, or the encroached upon branch cannot consent to the encroachment, and therefore disrupt our constitutional structure. One thing you've said, but I want to make it crystal clear, that overruling or narrowing Humphrey's executor would not threaten the existence of these agencies, but only would alter how the heads of those agencies can be removed, correct?  They'd be politically accountable to the president, and this court has in three different decisions addressed these kinds of broader implications, severability arguments, and come down there. The way we've done it is to sever the removal restriction, not to destroy the agency, correct? That's exactly right. On stare decisis, you used the word dangerous, I think, in your opening about the independent agencies. One of the things we consider are the, not only how wrong it was and reliance interests, but the real world impacts. And I think, just give you a little bit to explain why you used the word dangerous when talking about independent agencies, if I heard that correctly. And maybe to return to the exchange I had with Justice Kagan, the real world consequences here are human beings exercising enormous governmental authority with a great deal of control over individuals and business, small and large businesses and so forth, who ultimately do not answer to the president. That's a power vacuum. The president is answerable to the voters. They have no boss. And regardless of what happens, when there's a power vacuum, somebody's going to come into that power vacuum. So is it Congress that many commentators have noted actually exercise substantial control over these independent agencies through budgetary functions and through oversight functions? Is it industries engaging in industry capture of the agencies? The point is that power vacuum should not exist in our constitutional structure, because as Madison said, there's a line of accountability, a chain of dependence that runs from the officers to the president, and he's answerable to the community, which is the voters every four years. I want to return to what Justice Kagan and Justice Gorsuch were talking about with you in terms of the bargain. And I think broad delegations to unaccountable independent agencies raise enormous constitutional and real world problems for individual liberty, as you just mentioned. I've obviously said that many times in prior opinions. I thought one aspect of that that we've taken great steps to correct has been the major questions doctrine over the last several years to rein in what Justice Kagan was talking about, these broad delegations, to make sure that we are not just being casual about assuming that Congress has delegated major questions of political or economic significance to independent agencies or to any agencies, for that matter. You want to speak to the major questions doctrine and how that fits into your answer? Suffice to say that the major questions doctrine is not a substitute for the president's removal power. It may have done some work in backstopping the fact that we do have these independent agencies without a political discipline, but the president's removal power is what is dictated by the Constitution that the president must have the power to control and that these agencies, the one who has the power to remove, is the one who is the person that they have to fear and obey. Sorry to prolong this, but on your second question presented, on the second question presented, I just want to touch on that quickly. This is about the reinstatement argument that you make. I have some real doubts about that argument. We don't need to reach it, of course, if we agree with you on the first question. I have some doubts about that because that really would be an end run around the exceptions you had identified earlier for the Federal Reserve or for the non-Article III courts. In other words, you could just remove those people so long as you continue to pay their salary. You wouldn't have to reinstatement. That strikes me as really destroying the categories that you had identified as potential exceptions. So I'm concerned about your reinstatement argument on question two and just want to give you a chance to address that. Maybe I could just say two things. I think this court, and it's Wilcox-Harris' opinion, said something very telling. It's not binding on this issue. It's very persuasive. When it talks about how when it comes to the balancing of harms, the injury to the government from being forced to take back into the fold an executive officer that the President's really already ejected from the fold outweighs the interest of even a wrongfully removed officer, as I read that sentence, wrongfully removed officer from continuing to exercise their statutory authority. Don't you have a problem, again, here with Marbury on recognizing mandamus? I mean, I know a lawyer never wants to hear you have a problem with Marbury, but I think you have a problem with Marbury. I think the fact that the judicial officer there doesn't raise all these separation of powers issues. I mean, the other side says that's completely gerrymandered answer to the, I mean, yeah, but what's the principle on page, what is it? The principle, I think, is the separation of powers, right, because these removals of the executive branch, if you're removing a judicial officer, it just doesn't raise all these issues. And that's why the answer to that concern when it comes to Article III courts is not the President doesn't have removal power. It's that are these Article I or are these Article III? If they're in Article, I'm sorry, Article II. If they're in Article II, the President has control. If they're in Article I, then it may look very different. Thank you. Justice Barrett? So, General Sauer, you argue that the removal power comes from the vesting clause. And I understand why you make that argument, because that would be the broadest authority, because it would give, you know, that would be the full unitary executive theory. But there are other theories of where the power could be located. For example, if it was part of the Take Care Clause, then it might be more limited, because it might apply only or give removal authority only over those officers who exercise that significant discretion, or it might be an adjunct to the power of appointment, which would mean that inferior officers didn't come within it. And I don't read our cases to this point to really be very specific. They mention all three, and they could be mutually reinforcing. Is there any reason for us to be specific about it in this case? I think the court ought to adopt, as I read the cases, virtually every time the court has decided that certainly in fetal law and free enterprise fund, but also going back to the 19th century cases, the court looks to both the vesting clause and the Take Care Clause. And then in other cases, it also refers to the appointments clause and how the power to remove also flows to the power to appoint. So you have three kind of mutually reinforcing textual bases to place what, again, the court's decisions from ex parte to henum, through Humber's executive, decided as a settled beyond doubt, you know, exclusive and illimitable power of removal. So I think the text of the Constitution supports what you've referred to as the strong theory. And that's, I think, repeated again and again in this court's decisions where it started with the vesting clause. And of course, it's the logic of Madison's statements on the floor of Congress, the decision of 1789. Well, let's see. I know that that, obviously, I understand that's your first line position. And I do think that you could go back through the cases and find that. And I agree with you that we mentioned the vesting clause. I agree with you. It comes up in the decision of 1789, et cetera. But what I'm asking is, is there any reason that we have to, because it seems to me that there are very hard questions, Justice Kagan in particular was pushing you on them, about what the limits of your logic would be. And it seems to me that, and there's some dispute among us in the amicus briefs and the scholarship about which portion of Article II, or if it's in the appointments clause, would be the source of this authority. And is there any reason we have to decide that here, given that it might be relevant to some of the harder questions about limiting principles? I don't dispute that there might be narrower grounds on which the court could rule. But we'd encourage the court to adhere to the logic of all those decisions. Again, I've discussed nine decisions from 1839 to 2024 that talks about this removal power as exclusive and illimitable, conclusive and preclusive, and so forth. I mean, that really is the line of this jurisprudence. It's a compelling logic that Madison successfully advocated on the floor of the first Congress. We have to do the vesting clause. We think the vesting clause provides at least the clearest textual basis for it. I mean, when Madison said, for example, the power of overseeing and controlling those who execute the laws is the quintessential executive power, that's the logic of it. Could the court devise a holding that's based solely on the appointments clause? I wasn't proposing devising that holding. I was just proposing not being very specific about it, which I think some of our prior decisions have been. But let me move on. And actually, this is a question I truly don't know the answer to. And I just thought of it during the argument as we were talking about bargains. So both Justice Gorsuch and Justice Kagan were asking you about the bargain that Congress has made in creating these independent agencies. And I was struck by, you know, I remember Justice Gorsuch brought up in the tariff argument the fact that that tariff statute had a legislative veto originally. I don't know whether the original 1935 FTC Act from Humphreys did or did not. But I guess the question that I have, is that part of the bargain? Because legislative vetoes were pretty ubiquitous throughout the 20th century. And of course, we held them unconstitutional in Chadha. And if you had a legislative veto, even if Congress wasn't exerting itself the authority to fire the head of an or one of a member, a multi-member board, it could override decisions that the agency made. But I think I gather your point, part of your response to Justice Jackson, about why these agencies are different is it's not like they're answering to Congress either. You know, Congress creates them and it might put the removal restriction on them. And that might limit the president's authority. But they're not answering to either the president or to Congress. But when the legislative veto was in place, there was some measure of congressional control that is perhaps more significant than budgetary restrictions. I just wondered if you could speak to that. Two things, INS against Chadha correctly recognized that there was legislative control. I wasn't questioning Chadha. And Chadha, I think, very powerfully explains it. That's terrible. That is a huge separation of powers problem. And Congress has these, is attached a string to its delegation to control what executive officers are doing. And then the historical point that in Chadha, by the time of Chadha, that had been in place, legislative vetoes had been in place since 1932, over 50 years. There were 296 statutes with 295 legislative vetoes. And this court said they're unconstitutional. And the fact that Congress likes this encroachment power so much sharpens rather than blunts the court's review. But that's not quite the question that I had. I guess what I was wondering is, do you think it's part of the reason Congress was willing to infuse agencies with a lot of the broad powers? Justice Kagan was pointing out they now exercise a lot of rulemaking power. There's a lot of adjudicatory power. And I'm not saying, I'm not questioning Chadha. I think Chadha rightly, as you said, made the separation of powers point that Congress can't retain this power for itself. But I guess what I'm saying is, having lost that check, maybe these independent agencies have become something that Congress didn't intend or anticipate even at the point that it set it up, which is a point that Justice Gorsuch made in the tariff argument with respect to AIPA. May I just say this? I believe the FTC, I'm not aware of it having a legislative veto at any point in history. I could be wrong about that. But as Chadha points out, legislative vetoes started coming in vogue in 1932 and the FTC echoes back to 1913. So I'm not sure if that's part of the dynamic. Let me ask you a question about stare decisis. How should we think about reliance interests when it comes to reliance interests in government structure? Justice Sotomayor was pushing you about, had we ever overruled a case that was this old? And you gave lots of examples, and frankly, examples that came, I mean, eerie kind of came out of nowhere in overruling Swift, right? And here I would say there's been an eroding of Humphrey's executor over the years. But I think what Justice Sotomayor was really trying to get is not at, was there an age gap, but this kind of decision. And I'm not asking you whether there's been another analogous decision. But I think when we think about stare decisis interests, this kind of structural interest, which is really the interest that's been identified on the reliance side. Can you think of a case that talks about how the reliance factor stare decisis plays in here? I think Justice Gorsuch's opinion for the plurality in Ramos addresses this when he talks about how you're weighing, here you're weighing an injury to the constitutional structure. That's not a valid reliance interest. Reliance interest is the reliance of the American people in separation of powers and defending our liberties. If you look at actually human reliance interests, like entering into marriage, starting a small business, and so forth, you don't see a lot of people making decisions in reliance on the fact that there are multi-member agency commissions that have removal restrictions. The only actor here who's arguably relying is Congress. And Congress's act of reliance is itself the violation of the separation of powers. And where that's the case, the supposed congressional reliance interest should be given little or no weight in our view. And then, yeah, I think I'll say that. Justice Jackson? So I guess I really don't understand why the agencies aren't answering to Congress. Congress established them and can eliminate them. Congress funds them and can stop. So to the extent that we're concerned that there's some sort of entity that is out of and has no control, I guess I don't understand that argument. We would say the constitutional actor on the hypothetical who is controlling these agencies is Congress. And that is a huge separation of powers. Well, I understand. I'm just talking about it as a practical matter. Part of your argument seemed to revolve around this notion that there's some kind of thing happening with the independent agency that the reason why the president needs to control it is because they don't answer to anybody. And what I guess I don't understand is why they don't answer to Congress, which establishes the law that they are bound to follow and determines whether these agencies exist, funds these agencies, all of those things, it would seem to me, would be methods or mechanisms of control. The Constitution requires clear lines of political accountability. So if Congress is sort of informally actually controlling these agencies through like oversight Not informally, we have a statute. But let me ask you another question. I guess I have a very different view of the dangers and real world consequences of your position than what you explored with Justice Kavanaugh. My understanding was that independent agencies exist because Congress has decided that some issues, some matters, some areas should be handled in this way by nonpartisan experts. That Congress is saying that expertise matters with respect to aspects of the economy and transportation and the various independent agencies that we have. So having a president come in and fire all the scientists and the doctors and the economists and the PhDs and replacing them with loyalists and people who don't know anything is actually not in the best interest of the citizens of the United States. This is what I think Congress's policy decision is when it says that these certain agencies were not going to make directly accountable to the president. So I think there's a pretty significant danger that Congress has actually identified and cares about when it determines that these issues should not be in presidential control. So can you speak to me about the danger of allowing in these various areas the president to actually control the transportation board and potentially the Federal Reserve and all these other independent agencies? I think the court said it well in Free Enterprise Fund when it said that we can have a government that functions without rule by functionaries. We can have a government that benefits from expertise without being ruled by experts. Well we can have but I'm asking you about Congress's choice, Congress's decision that in these particular areas we would like to have independence. We don't want the president controlling. I guess what I don't understand from your overarching argument is why that determination of Congress which makes perfect sense given its duty to protect the people of the United States, why that is subjugated to a concern about the president not being able to control everything. I mean I appreciate there's a conflict between the two but one would think under our constitutional design given the history of the monarchy and the concerns that the framers had about a president controlling everything that in the clash between those two Congress's that we should be able to have independence with respect to certain issues should take precedence. The constitutional design sets up three branches of government. It forbids Congress from controlling what the executive branch does and also forbids Congress from shaving away the president's control. And what I'm positing is that Congress's decision here is not shaving away the president's control. You cast it as that and I appreciate that but instead what Congress is doing is saying we'd like to have independence. Nonpartisan experts working on certain issues for the good of the American people. And I understand that the president would rather control them but it's not really his decision in the overall scheme of things I say. Why am I wrong about that? Under the constitutional design. It is the president's decision as to how the government is structured and who should be doing what. No that is largely Congress's decision with certain exceptions. Congress cannot violate the separation of powers and threaten all of our liberties in the way that it structures the government and it has done so here. One last question. I appreciate the effort to try to make this not seem as big a deal as it might be by focusing only on the FTC and saying this is really just about what happens and we'll cross the bridge of the other agencies when we get to it. But can you just give us a sense because I'm sure you must know this of what other agencies there are that have the kind of removal protections that are at issue here. There's some, what, two dozen? That's what field law said. That's probably a good accounting and obviously we have challenged four of them in this court and we're challenging a handful of others. But you could challenge the National Labor Relations Board, the Nuclear Regulatory Commission, the Commission on Civil Rights, potentially the Sentencing Commission, the Occupational Self-Safety and Health Review Commission, the Consumer Product Safety Commission. All of these have that kind of structure. I don't know if all of those are on the list. Certainly some of them are. And some of them, many of these agencies we are litigating, including in this court. Thank you. Thank you, counsel. Mr. Huggable. Mr. Chief Justice, and may it please the court. The President's constitutional duty to execute the law does not give him the power to violate that law with impunity. But petitioners claim that the President was free to fire, commission or slaughter without cause in violation of the FTC Act as authoritatively construed by this court. And they urge, even if that firing was illegal, there is nothing that any court anywhere at any time could do to remedy that violation. The district court correctly rejected both arguments and its judgment should be affirmed. On the merits, multi-member commissions with members enjoying some kind of removal protection have been part of our story since 1790. So if petitioners are right, all three branches of government have been wrong from the start. Congress and fire presidents have been wrong to jointly create early founding era commissions and more than two dozen traditional independent agencies since 1887. And this court was wrong to repeatedly bless those laws and to unanimously uphold the exact same removal provision at issue here and Humphrey's executor almost a century ago. Reasonable people can and do disagree about first principles, but any abstract theory that would wipe away so much history and precedent should be a non-starter. At a minimum, petitioners would need an airtight theory to justify the radical change that they now seek. And they don't have one. No tool of interpretation clearly supports the president's assertion of an unrestricted and indefeasible authority to fire the heads of traditional independent agencies like the Federal Elections Commission and the Nuclear Regulatory Commission. Plus, petitioners' theory cannot be reconciled with their own apparent position on the Federal Reserve and Article I courts. Finally, stare decisis militates against overruling a century of precedent at this late date. The political branches are more than up to the task of finding reasonable legislative solutions that strike an appropriate balance. That kind of legislative solution is far preferable than abandoning a foundational precedent on which so much of modern governance is based. I welcome the court's questions. Was Humphrey's executor an executive branch case? It was an executive branch case, Justice Thomas, insofar as the FTC is an entity that is not operating under the auspices of Articles I and III, but it is also a case in which Congress and the president coming together have determined that it's not part of a traditional executive department. Did the court and Humphrey's executor distinguish it from its earlier president in Myers? The court, yes, absolutely distinguished the FTC from its earlier president in Myers. Wasn't that distinction based on its function more as a quasi-legislative, quasi-judicial agency as opposed to an executive branch agency? It was based in part on functions, Justice Thomas, but it was also based on the placement of the agency and the considered determination of Congress and the president together that this was the kind of agency that should be insulated from presidential at-will removal. Now, you rely on the reliance interests of Congress and reliance interests, I guess, of others of the agency heads on the structure of this agency for so many years. What is it? Seventy years, you say? The FTC is 111 years old. But from Humphrey's executor. Ninety years. How would you have applied that in the overruling of Swift v. Tyson, your reliance interests? Yeah, so Swift v. Tyson deals with a completely different kind of situation with respect to the Erie Doctrine. So there was no reliance interests? So reliance interests with respect to choice of law determinations. I haven't thought through that systematically, Justice Thomas, to tell you the truth. I do think that there is a reliance interest here that is both immense and undeniable, and that is the fact that Congress and the president have determined that there are certain statutory authorities, not constitutional authorities. That's statutory authorities that the executive branch would never have in the absence of congressional legislation that Congress and prior presidents thought should not be under the sole control of just one person. And that reliance interest would be completely destroyed by retroactively destroying the independence of traditional agencies. I don't know what a traditional executive administrative agency is, but could Congress limit the removal authority of the president in a newly created executive branch agency? Let's say, for example, a few years ago, EPA became an executive branch agency. It was more of an administrative agency, a subcabinet. Could it, in doing that, limit the removal authority of the president, of the head of the EPA, or Homeland Security? I think it is within the realm of possibility, Justice Thomas, and I don't think that the court ex ante should adopt any kind of categorical rule precluding that possibility. No, I'm trying to, again, the SG was asked about the logic of his argument. What's the logic of yours? How far does it carry you? If this is an executive branch agency, and your distinction is this is a multi-member agency, why doesn't the logic take you to a single head agency also? So you're asking whether a single headed agency could be converted into... No. Well, I haven't gotten there yet, but that would be the next step in order to make them removable, to make the heads of the agency or the principals removable. So there are constraints. One of the constraints is that the creation of the agency and the insulation from presidential control cannot interfere with the president's conclusive and preclusive constitutional authority. You still haven't told me why can't, tomorrow morning, Congress decide that the Secretary of Congress should be removable and should limit the president's authority to remove the Secretary of Commerce? That would be squarely foreclosed by this court's decision in FILA law, as we understand it. And that is to say this court in FILA law held that there is a particular serious threat to individual liberty that is posed by single headed agencies that wield significant executive power. Could Congress convert all these departments into multi-member commissions? The Commerce, EPA, Department of Homeland Security, Department of State, convert them all into multi-member commissions and make them removable only for cause? No. I think, Justice Kavanaugh, we're looking at three buckets here. In one bucket, including the Department of State, you would have departments that, under no conceivable circumstance, could practically be converted to a multi-member commission because they are wielding so many of the president's conclusive and preclusive constitutional authorities. But that is a relatively small bucket. Let's say Department of State, Justice, Defense, Homeland Security, probably. You're saying, though, that they're limited by practical concerns or constitutional concerns? Constitutional concerns. And the practical concerns will come up as well. Well, let's put aside the practical concerns. I'd like to understand, the answer to Justice Kavanaugh, why tomorrow Congress couldn't transform every cabinet official into a multi-member group. What's the constitutional problem with that? I think is what my colleague was getting at. Absolutely. And the constitutional problem, in our view, is that Congress cannot limit the president's authority over officers who are wielding the president's conclusive and preclusive constitutional powers. And that is a line that goes all the way back to Marbury v. Madison. It's a through line through this court's jurisprudence. The SEC has the authority to enter foreign agreements, right? I mean, how do you decide what's conclusive and preclusive? It does not have the authority to enter into foreign agreements on its own, Justice Barrett. The statute expressly provides that the Secretary of State's approval is required before any kind of agreement is executed. And the Secretary of State, of course, is subject to the president's plenary removal power. You talked about free, I'm sorry. I just want to make sure I understand, because it's fairly basic. I mean, are there some cabinet departments that you say Congress could just take over? Department of Veterans Affairs, Department of Education, they think, well, we can do, experts can do a better job of it. And so we're going to say there is now an agency, the Agency for Education, and it will be run by, whether it's a multi-member group or not, we think it's important for Congress to have greater control over education. So we're creating this new agency and its authorities will be everything that the current Department of Education has, except it will be run by a commission and they can only be removed for a cause. Is that all right? Yeah, I think that it is probably within the realm of possibility for agencies. Yes, Chief Justice Roberts. And the constraint historically has been that these types of determinations have been made through a process of political accommodation between Congress and the president. And over the course of more than 200 years, we have not seen. Well, I'm sorry to interrupt, but sometimes that accommodation is greater than in other times. I mean, we have situations, let's say, where the Congress, both houses are controlled by one party and the president is of the same party. And they may decide that the government would be structured better by taking over these entities. And so which departments could Congress impose a multi-member commission instead of a secretary? So if you're asking about which ones could be converted today, I think it's probably a pretty small universe in terms of the numbers that could be wholesale transformed as they are currently constituted. Why? Because it appears that the vast majority of executive departments wield at least some powers that this court would deem to be conclusive and preclusive, including under the standard that this court enunciated. How are those? I'm sorry. Keep going. Including under the analysis that this court set out just last term in Trump, the United States, where at pages 620 to 621, the court explained that the president does have a conclusive and preclusive authority with respect to certain criminal investigations and prosecutions. And that informed the court's determination about whether the acting attorney general was subject to at-will presidential removal. It turns out that the vast majority of these executive departments do have some kind of criminal investigative authority, including armed law enforcement agents authorized to make arrests. Now, that's a significant bucket. You probably have a very- Every agency in the government today has an armed police officer, their own police force. Is that really the test of what's conclusive and preclusive? So we're not- I mean, it rhymes, but I don't know what it means. Justice Gorsuch, I think you're making a good point insofar as you're saying there's a lot of what these agencies do that would not be deemed conclusive and preclusive, and we absolutely acknowledge that. And- So the answer to Chief Justice's question is tomorrow we could have the Labor Commission, the Education Commission, the Environmental Commission, rather than Departments of Interior and so forth. So I don't know that you could do it tomorrow because, like I said, for the vast majority of agencies, there are at least some conclusive- So it has- What's the percentage then? The- So I don't want to pretend, Justice Gorsuch- I want to know where the threshold of preclusive and conclusive comes in. Yes. And so what we would say is that if the- Is it a mere scintilla? I think that's what- I think you would have a separation of powers problem if an agency, even if it's a vast agency wielding a broad panoply of powers, if one of those powers is the president's conclusive and preclusive authority, and the officers who are exercising that power are insulated- So as long as one person in the agency is exercising conclusive and preclusive, whatever that means, that's enough. So it's enough to have a separation of- and I wouldn't just say person, I would say a principal officer. It's enough to generate a separation of powers problem. And what is the remedy for that problem, I think, is an analytically more difficult question. What's the difference- It strikes me, Mr. Agarwal, as I listen to this, you know, if you go back to, let's say, the Education Department, which the Chief Justice raised, that the more realistic danger here is that we'll have an education department, as authorized by Congress, by law, that won't have any employees in it. I think you're absolutely right, Justice Kagan, that there are competing dangers here, and it makes a whole lot of sense to us to weigh the real-world dangers that we know are a virtual certainty that would result from adopting petitioner's constitutional theory. And to contrast those with purely hypothetical risks that have never materialized over the course of American history. And even in the unlikely event that Congress tomorrow was to try to start taking cabinet departments that have been around for a long time and to convert them wholesale into multi-member agencies, which they have never tried to do before. But even if they tried to do that, of course, that would be subject to a presidential- Well, I think there's one thing history shows is that we can't anticipate what might happen. And so we might be able to predict what is likely to happen in the very short term. But we don't know. I mean, if we decide this case in your favor now, we don't know what a Congress in 15 or 20 or 30 years might do. We might be able to predict what's likely in the short term. So, I mean, this is going to have longer-term implications. So absolutely. But let me make two points on that. First, there is currently no constraint. There's currently no case that has ever held that Congress cannot give for-cause removal protections to principal officers serving-to a single layer of for-cause removal protection for principal officers serving on a multi-member commission. And nevertheless, notwithstanding the absence of any such precedent throughout American history, we have not seen an epidemic of these problems. In fact, we haven't seen this problem materializing at all. But let me make one other point about the real-world danger that is imminent right now that we know will happen. And that is that if petitioners get their way, everything is on the chopping block. And we're not just talking about the FTC. Opposing counsel said, we're not challenging right now the Federal Reserve. We're not challenging Article I courts. But there is absolutely no principled basis for carving those very important institutions out of their rule. And you're right that the Solicitor General was pressed quite legitimately about things like the tax court and the claims court, et cetera, et cetera. But I don't know that you can make the argument that the logic of his argument is going to cause these allegedly revolutionary results without being prepared to explain more concretely than you have the limits of your own argument. I mean, I could go down the list with you of the cabinet officers and ask you whether you think they could be headed by a multi-member commission whose members are not subject to at-will removal by the president. Should we do that? How about Veterans Affairs? How about Interior? Labor, EPA, commerce, education. What am I missing? Agriculture.  Mr. Agrawal, are you prepared? There was a question there. Yes. So I don't want to pretend to greater certainty than I have about the full gamut of statutory authorities vested in all those other departments. I will say that based on a very quick preliminary analysis, it appeared to us that the vast majority of executive departments wield at least some of the conclusive and preclusive authorities that this court has recognized in the past, including criminal investigative and prosecutorial authorities and also authorities implicating national security and foreign relations. Now, that is not to say, Justice Alito, I think you're absolutely right to say for a lot of those, you could probably take those out. And at that point, there's going to be a fair question about whether Congress and the president acting together could determine at some point that there is a need for a multi-member body of experts to preside over certain government functions. And what I would say is I don't think that you should categorically rule out that possibility as a matter of constitutional law. And I can't sit here today and tell you that there's a distinction of constitutional proportions, for example, between the Department of Labor and the National Labor Relations Office. Well, how about the post office at the time of Myers? How does your exclusive and preclusive theory account for Myers? How can it be that the postmaster at that time exercised exclusive Article II power, but the Federal Trade Commissioner does not? So I would say three things about that. First, the conclusive and preclusive standard does not have to be the sole and exclusive limiting factor. Second, there is a provision that Justice Barrett referred to in the colloquy with opposing counsel about the Take Care Clause. And it is conceivable that at least in some circumstances, the Take Care Clause might itself not always but sometimes impose a conclusive and preclusive standard, for example, with respect to officers like the postmaster and Myers who are deemed to possess purely executive functions as this Court unanimously and Humphrey's executor, and then again Weiner unanimously characterized the functions of the postmaster and Myers as purely and obviously just executive. So that's a second constraint. When you answered Justice Alito about the agencies exercising investigative power, and thus there would be a question whether they could be made independent multi-member commissions, don't a lot of the now independent agencies also exercise that kind of investigative power? At least from my experience, it's very hard to get into the weeds of this particular powers exercised by the FTC and distinguish it from some of the powers exercised by some of the other cabinet agencies that we traditionally think of as executive or the FCC or the SEC. All of those seem to furk NLRB when you get into them all. So what's your answer to that? My answer is the criminal investigative authority is different, and certainly a lot of these agencies have civil investigative authority, including the FTC. As we understand this Court's precedent just from last term in Trump v. United States, criminal investigations and prosecutions are in a different category, at least as a general matter. And if the logical import of that analysis is that there are certain functions that cannot be wielded even by traditional independent agencies, then so be it. That's the law of the land. That's right. I'm sorry. Go ahead, please. Go ahead. Go ahead. I understand conclusive and preclusive entirely as we used it. When you're speaking about executive power, can the president control what's done in his departments? I get that. And criminal prosecution is a good example. I do not understand it as you use it. Why isn't it just as conclusive and preclusive to decide whether to bring charges under the FTCA Act against somebody? Civil versus criminal. It's a conclusive and preclusive decision about enforcement decision of the power of the federal government against individuals across the country. So there's a legal answer and there's an historical answer, and they might blend, Justice Gorsuch, and the legal answer is that we don't have any controlling authority that has ever held that civil enforcement as a categorical matter is the kind of thing that can never be vested in a multi-member agency that enjoys a modicum of insulation from political pressure. And we know that, for example, from this court's unanimous decision in Humphrey's executor, where you had that kind of civil enforcement taking place, and a unanimous court, including all four justices from Myers, said that's okay. And the kind of civil enforcement that was going on there, you had complaints being issued, you had cease and desist orders. Cease and desist orders, but not lawsuits in court. They had to go to court. And I'm just curious, though, fine, I accept your point. It's a good point about Humphrey's. But why isn't that conclusive and preclusive decision whether to use the federal government's full power in a prosecution where you can seek fines and incur all of the penalties that are associated with violating the FTC Act? So I think part of the answer is historical, and part of the answer is functional. And on the historical part, we have had all kinds of civil enforcement of federal statutes taking place, including just private statutes that authorize private attorney generals, as this court has recognized in many, many cases. So you have a long, long history and tradition of private actors wielding kind of — enforcing civilly federal statutes. Now, I take the point that civil enforcement on behalf of the government of the United States — That's not the executive power, but criminal actions is the executive power. Yeah, I would not say — That's what you're asking us to — No, I would not put it that way. I would not say it's not executive. And in fact, in Selah Law — So it is executive? Yeah, in Selah Law, this court said it's not only executive, it's quintessentially executive. And that's okay, because agencies like the FTC also engage in adjudicative activities, and that would be deemed quintessentially judicial. And nevertheless, they're not subject to plenary removal on the part of the judiciary. They engage in rulemaking that could be considered quintessentially legislative. And nevertheless, they're not subject to plenary control on the part of the legislature. The issue is whether — not whether it's executive in some sense. The issue is whether it's constitutionally committed to the president's sole and exclusive discretion. And as a matter of history and precedent, we haven't gotten there yet. So even some quintessentially executive functions, in your view, are not vested in the president of the United States? I would not say that — I would not put it in this — I would not say that they're — yes, I would — I would say — I think you have to say yes to that, based on what you've just — They're not constitutionally committed to the person of the president and to his sole and exclusive discretion. Didn't we suggest as much in Humphreys? I mean, didn't we sort of — we have some lines in Humphreys that say, to the extent that it exercises any executive function as distinguished from executive power in the constitutional sense, it does so to discharge — it does so in the discharge and effectuation of its quasi-legislative or quasi-judicial powers. So I thought that in Humphreys, we recognize this idea that you could have an agency that's exercising legislative or judicial powers, still engaging in some executive function, and that doesn't make it an executive agency. That is exactly right. And on top of that, we have a lot of agencies over a long period of time engaging in all manner of civil enforcement of federal statutes. And yet, we do not have a single example of any case from this court in more than two centuries that has ever held that a single layer of forecast removal protection cannot apply to a principal officer of an agency wielding that kind of civil enforcement function. And so I think that's like your real point. In other words, you're not asking for some sort of conclusive or preclusive rule. That's not your burden in this situation. You are just saying that the way the law has been interpreted by the court here, the existence of Humphreys and Congress's reliance on these kinds of multi-member agencies for something like 90 years plus, that's the background rule. And so now it's up to the government and the officer general to come in to suggest that there's a constitutional problem with that. That is absolutely right. We have a 111-year-old statute that was enacted by the people's elected representatives. It was signed into law by a president of the United States. It was unanimously affirmed by this court, and it's been followed by every single president since 1935 until the present. We don't need an abstract theory to tell us that the FTC Act is okay. It's the other side that needs to give you a really compelling theory to explain why, in our view, 200-plus years of precedent and history need to be abandoned. But in any event, even by their own acknowledgement, we're talking about the modern era of traditional independent agencies, which spans more than half the life of the republic. Can I ask you about some other limits of your argument? So most of the independent agencies by statute must include members of both major political parties. Is that a constitutional requirement? I don't think so. Could Congress create independent agencies with, let's say, 10- or 15- or 20-year terms? I do think at some point, Justice Kavanaugh, that if there is not sufficient mechanisms of adequate presidential supervision, that you could have a problem. My advice to the court— This is important. Why? You've got to have a theory on that. Yeah, absolutely. So there is a take-care clause in Article 2, Section 3, and we don't dispute that the activities of these agencies are operating within the purview of the executive branch, and they should be subject to constitutionally appropriate presidential supervision. So do they have to turn over with each new president, then? So in the case of the FTC, I don't think you want to— And if they don't have to turn over with each new president, what's the difference between seven years and 20 years, constitutionally speaking? I think our position is that the FTC, no matter what kind of rule that you articulate would be okay, because we have the staggered terms, and presidents have the opportunity as a practical matter to influence the composition of the FTC, you start to get into more difficult line-drawing problems if you imagine hypothetical scenarios where presidents who have longer terms and maybe fewer officers, and maybe presidents in that circumstance don't have— The chair has been removable at will as chair by presidents, but that's been a matter of statute for most of these. Is that constitutionally required? No. And we know that from Humphrey's executor, actually, because at the time of Humphrey's executor, the chair of the FTC was not removable by the president, and now it was in the Reorganization Act that took place some 15 years later. The president now has that designation. I think putting those three together, your position would allow Congress to create independent agencies, maybe converting some of the existing executive agencies into independent agencies with no political balance requirement, with a long-term, say, 10 or more years, and with the chairs not subject to removal as chair. So you can imagine a situation—and I just want to give you a chance to deal with the hard hypothetical—when both houses of Congress and president are controlled by the Senate party, them creating a lot of these independent agencies with or extending some of the current independent agencies into these kinds of situations so as to thwart future presidents of the opposite party. And to Justice Barrett's point, I don't think we can just say, oh, that hasn't happened, so it'll never happen. Absolutely. And I don't think that you should articulate a rule that categorically rules out the possibility that some statute in the future might not provide for adequate tools of presidential supervision. But what would be the theory? I mean, that's what I'm getting at. There's, you know, just picking something out of thin air. What is the theory? One textual basis in the Constitution for that would be the Take Care Clause of Article 2, Section 3, which does require the president to take care that the laws be faithfully executed. And this Court could hold that that requires that the president have constitutionally adequate means of supervision, such as those that are adverted to in Part 3C.2 of CLL law that discusses exactly the types of considerations to which Your Honor is referring, the designation of the chair, the staggered terms provision, and the opportunity to influence the composition of the commission, budgetary tools, all of those the FTC has, and so we're on the right side of the line wherever you draw that line. But I guess the bigger point is that historically, this is a problem. This is a problem that has been resolved through a process of political accommodation. And there's no reason to believe that that process, which has been adequate for a very long time, will not be adequate in the future. But if it is, the Court can keep open the possibility that there will be time enough to decide on new constitutional rules. How do you answer the accountability theme, which I think is the theme of the other side, is that independent agencies are not accountable to the people, they're not elected, as Congress and the president are, and are exercising massive power over individual liberty and billion-dollar industries, whether it's the FCC or the FTC or whatever it might be? May I answer? Sure. It is an entirely legitimate concern, but there are countervailing accountability and liberty concerns on the other side. And so, for example, we have an amicus brief that is submitted by the Reporters' Committee for Freedom of the Press in this very case that talks about real dangers to freedom of the press, to individual liberty, to free speech rights that would result from saying that agencies like the FCC are all of a sudden subject to at-will presidential removal. And they discuss the history, just as one example, this precious First Amendment right that could, in every meaningful sense, be jeopardized if we abandon longstanding history and retroactively invalidate the independence of independent agencies. The last thing I would say, if I may, Justice Kavanaugh, in response to that point on political accountability, is that I think it would be a really unfortunate way to vindicate the principle of democratic accountability for this Court to effectively invalidate. We're not talking about one or five or 10 or even 15. We're talking about more than two dozen traditional independent agencies that have been established by statutes enacted by the people's elected representatives and signed into law, all of them, by democratically elected presidents. If it is really true that these kinds of for-cause removal protections, which after all authorize the president to fire commissioners just for good cause, if they really pose this fundamental threat to the republic, petitioners could take their argument across the street and Congress could solve the problem tomorrow. They're not willing to do that. Thank you. Thank you, Counsel. You've mentioned Humphrey's executor quite a bit and also seal the law. The one thing seal the law made pretty clear, I think, is that Humphrey's executor is just a dried husk of whatever people used to think it was, because in the opinion itself, it described the powers of the agency it was talking about, and they're vanishingly insignificant, has nothing to do with what the FTC looks like today, and yet it seems to be your primary authority. It was addressing an agency that had very little, if any, executive power, and that may be why they were able to attract such a broad support on the court at the time. I mean, putting Humphrey's executor aside, what's your next good case? We have two other cases in which the court has had occasion to assess the constitutionality of a single layer of forecaused removal protection applicable to a multi-member commission, and those two cases are Wiener v. United States and Free Enterprise Fund. In both of those cases, the court unanimously concluded that a single layer of forecaused removal protection does not offend the separation of powers, even with respect to agencies that were wielding what everybody today would consider significant executive authority. Well, certainly Wiener is sort of a protege of Humphrey's and does exercise significant authority, but of an adjudicative nature, and I don't know if that, again, should be considered in a direct line from Humphrey's or an entirely different situation involving adjudicative authority that the court did not say in deciding Humphrey's was at issue. A couple of responses to that, Mr. Chief Justice. First, petitioner's theory is based on the assumption that any time you have an officer who is acting outside the auspices of Articles 1 and 3, no matter what kind of function they are discharging, what they are doing, quote, is and must be deemed an exercise of the executive power, and if that is true, that sweeps in the commissioners of the War Claims Commission, it sweeps in the Federal Reserve, it sweeps in the Court of Appeals for the Armed Forces. Their constitutional theory cannot be distinguished on that basis. Well, what about regarding them, as I think Justice Gorsuch was discussing at one time, as adjuncts to the judicial authority, which would be something that would cover the court, I think, in Wiener? If this is a viable distinction, to say that there are certain functions that are being performed that are of an adjudicatory nature, and that some kind of exception should be carved out for that, then why not for the FTC, which, after all, does exercise adjudicative powers, indeed, as this Court explained in Axon Enterprise, the FTC stands in the shoes of the district court in such cases. It's doing exactly the type of thing that district courts do. It's finding facts and reaching conclusions of law. Yeah, but it does a lot of stuff in addition to that that Wiener, the court in Wiener did not do. And many of these other entities that you've been talking about, which exercise judicial responsibilities, might properly be considered adjuncts to the judicial power in Article III, as opposed to purely executive power, which was not at issue in Humphreys or Wiener. Two responses to that, Mr. Chief Justice. In Wiener, the Claims Commission members were making final and unreviewable determinations with respect to claims for compensation. And they were getting no judicial review. That was final determination. But the more important point is that in Free Enterprise Fund, there was all manner of executive authority that was being wielded by the—we're not talking about the 1935 FTC. We're talking about the 2010 Securities and Exchange Commission and the 2010 Public Company Accounting and Oversight Board. This court characterized the board's functions as involving enormous power to regulate an entire industry. Nobody would say that that was not executive. And nevertheless, the court unanimously concluded that a single layer for a cause of removal protection, exactly what we have here, is constitutionally permissible. On top of that, we don't, again, have a single case that has ever struck down the kind of removal protection that we have here in more than 200 years. Thank you. Justice Thomas? You used—when I asked you, or when a number of us asked you about making some of the—currently the executive branch, cabinet-level agencies, multi-member agencies, you resorted to the functionality of the current agencies, such as Commerce, as precluding that, or at least as being a basis for not doing that. Now, moving the other direction, could you functionally—you say that from a functional standpoint, the FTC is not an executive branch agency, and you listed some of its functions. Could Congress convert the FTC to a single-member head with the same protections, because it engaged in discharging the exact same functions? No, under this Court's precedent. No. Could they, under the logic of your argument? No. We accept CLA law as not only the law of the land, but as being correct. What's the limitation? Your argument was functionality before, not necessarily precedence. And I'm interested in why would the FTC functionally be any different as a single-member head than it is as a multi-member agency. It is because CLA law is correct, not just because it's precedent, but because it's correct to hold that there is a particular danger to individual liberty that is posed by the single director, highly anomalous circumstance that had no foothold in history and tradition, and that vested a massive quantum of power in one person who was not directly accountable to the president. I don't understand why that's any different from a multi-member agency. For all the reasons, Justice Thomas, that this Court explicated in CLA law itself, and in particular in parts 3C1 and 3C2 of the decision, where the Court talked about basically two categories of considerations. One is the foothold in history and tradition, and the second is whether the configuration of the agency poses a problem for structural separation of powers principles. And in both of those, the Court explained, and elsewhere throughout the opinion, the implications for individual liberty of taking massive amounts of governmental power and putting them in the hands of one person who's not accountable to the president, as opposed to where you have the multi-member structure as a practical matter, there needs to be consensus, there needs to be deliberation, there's a safety valve in terms of dissenting opinions can be issued, and that can provide an alert to the public that something is going on. So there's a whole variety of reasons why single-member agencies have been distinguished from multi-member commissions, and we think that precedent is correct and should be adhered to. On that point, Justice Thomas, I guess I would say one more thing, and that is I think it is a big difference between our position and the position of the petitioners, that we are asking the Court to adhere to all of its precedents and to give effect to the collective wisdom and experience of all three branches of government. On the other hand, petitioners are asking you to abandon precedent after precedent after precedent. A lot of precedents would go south if their constitutional theory is correct, and a whole lot of history and dozens of institutions that have been around for a long time, that have withstood the test of time, that embody a distillation of human wisdom and experience, all of those would go south. Justice Alito? To follow up on Justice Thomas's question, suppose that the FTC did not have — that the members, commissioners, did not serve seven-year terms, staggered seven-year terms. Suppose there was not the requirement that no more than four be members of a single political party. Suppose that they just served very short terms. Why does it matter that it is a multi-member body as opposed to a single-member body in itself? What is significant about that? The significance is the distinction for purposes of individual liberty, the threat that is posed to individual liberty by single-headed agencies that are not accountable to the President. That, as I understand it, Justice Alito, is the logic of this Court's decision in seal of law, and we recognize that intelligentsia — Well, seal of law didn't — I mean, seal of law didn't have to decide the questions before us here. Suppose that there were two FTC commissioners and they served one-year terms, and you would say, well, that's okay, but there's a difference between that and an agency that's headed by a single member. Making the terms shorter, in my view, would not raise constitutional concerns because that would only increase presidential opportunities to influence the composition of the agency, reducing the number of commissioners might be a different type of situation. I'm not aware of any two-headed agency that has ever been created in the modern era or throughout American history. Well, okay, what we're looking for are conceptual explanations for the distinctions you're drawing, but let me move on to something else. Suppose the Department of Justice were split into two parts. One part has the authority to enforce the criminal laws, and the other part has the authority to enforce civil laws. Could the civil component — could Congress put at the head of the civil component a multi-member commissioner with removal protection? Justice Alito, there is the logically antecedent question with respect to any removal protection of whether Congress has constitutionally enumerated authority to enact the protection in the the relevant source of constitutional authority would appear to be the necessary and proper clause in terms of attaching removal restrictions to a federal office that is created by Congress. I don't think it's obvious that you would comply with all the strictures of the necessary and proper clause ex ante, and so it's not obvious that Congress could do that, and what we know for sure is that Congress has never tried to do that. Well, I know. You keep answering it hasn't been done and it's not going to be done in the future, but I want to understand the limits of the principle that you're asking us to accept. So you're not — you cannot say, no, that would not be permitted for this reason. The best you can say is that it might not be necessary and proper. If you wanted — that is one source of limiting principle for sure, but also our argument is predicated in part on a long historical tradition pertaining — Okay, I understand the historical argument. That wasn't what my question was getting at. All of the civil enforcement laws, all of the civil laws that are now enforced by the Department of Justice were enacted by Congress under one of its enumerated powers. Let's assume that they were all constitutional so that the question is whether it would be proper to the enforcement of those to — given the understanding of necessary and proper, to entrust that to a multi-member commission as opposed to a single officer like the Attorney General. That would be the question. I don't think so, and what I was trying to get at before is not just that there's an historical tradition. It's that the historical tradition we're invoking is for what are called traditional multi-member regulatory commissions, and those historically have never involved pure — just purely executive civil enforcement. They involve a blend of lawmaking, adjudicatory, and enforcement actions where the enforcement authority is deemed to be reasonably ancillary to the other functions. So the kind of hypothetical that you're positing, Justice Alito, I think it's an absolutely legitimate concern, but the historical tradition that we are drawing on for purposes of our constitutional liquidation argument would not require you to affirm the constitutionality of that kind of highly unusual structure that, as far as I know, has never been attempted before. On the question of giving the members of a multi-member commission longer terms of office, so here we have seven years. What if it were increased to 10 years? What if it were increased to 15 years and so forth? And the principle that you would have us apply is whether that longer term of office preserved adequate presidential supervision. Is that your answer to the question?   That is one potential limiting principle. I know that —  We would have to — in each of those — in every case in which that would be involved, we would have to make — we would have to determine, do I think this preserves adequate presidential supervision?   Our primary submission to you, Justice Alito, would be that it would not be the burden of the court to develop ahead of time constitutional — heavy-handed constitutional rules that would try to make constitutional distinctions between, say, a seven-year term and a nine-year term or an 11-year term. Those don't appear to us to be distinctions of constitutional proportions. Members of the Federal Reserve do have substantially longer terms than, say, FTC commissioners, and nevertheless, petitioners don't seem to have a problem with members of the Federal Reserve enjoying statutory removal protections. But our position is that the court should recognize that these are really difficult line-drawing problems, and the way that that has historically been resolved is through the political process, and the political process is up to the task of dealing with this problem. But you wouldn't say that we leave it — would you say we leave it completely to the political process? No. So that at no point in the extension of these terms would we say, oh, there's a problem. I thought you were saying there is a test, and it is whether there's adequate presidential supervision. And if that were challenged, we would have to decide. We would have to exercise our judgment about how much presidential supervision is necessary to satisfy constitutional requirements. Absolutely. The court should not relinquish its authority to establish judicially enforceable outer boundaries in this context. I just don't think that you're going to have to do that anytime soon, and you might never have to do it, but you should absolutely not relinquish your authority to do it. And there could be hypothetical scenarios in the future in which there's an arrangement that just palpably does not guarantee adequate presidential supervision. But that hypothetical risk, again, has to be measured against the real-world chaos and disruption that will be caused by taking —  One other question about where your argument would lead. So to go back to this issue of the various departments and whether it would be permissible for Congress to convert them into agencies headed by multi-member commissioners, by multi-member commissions with members protected from plenary presidential removal authority. The test would be whether some limit on permissible — I'm sorry, limit on exclusive and preclusive activities was exceeded. Our primary — Do they go to — if they're exercising any power that is exclusively and conclusively the president's, do they — are they exercising too much of that? That would be the test in going through these supplies? No, no. I think if they're exercising any power that is conclusive and preclusive, then you have a separation of powers problem. That's the solution to which is not necessarily to strike down the entire agency or even to eliminate the for-cause removal provision. It creates an analytically distinct issue about how you remedy that violation. But I think any conclusive and preclusive power that is vested in an agency that is not sufficiently accountable to the president is a problem. I thought you had answered — in answer to a prior question, you said a mere scintilla would not be enough. But now you say a mere scintilla would be enough to cause a problem. I may have misspoken before, Justice Alito, and if I did, I apologize. But our position is that if a multi-member agency is vested with the president's conclusive and preclusive powers and it is insulated from at-will presidential approval — supervision, that is a separation of powers problem. It does 200 things, and one of the 200 things involves the exercise of an exclusive and conclusive presidential power. That would be too much. That would be too much with respect to that power, but maybe the solution to that is to sever out that power and not to strike down the entire agency. Thank you. Justice Sotomayor? Counsel, Sheila Law involved the CFCP, and it relied very heavily on — focused very heavily on the novelty of the CFPB structure and the fact that it was a historical anomaly, correct? Absolutely. It was an anomalous structure that was deemed to pose a significant threat to individual liberty. All right. That's not the case here, because we have a precedent of longstanding that says this is okay. The chief asked the question about whether the additional powers the FTC has gathered create a different situation. As I see it, and as the judge in the district court outlined very clearly, most of the original powers of the FTC when Humphrey's estate was decided exist — are the same powers of today, correct? That is correct. And there is one power that I've identified that might be different, and that the FTC's cease and desist orders have now binding effect immediately, correct? I believe that's correct. So I think your point in response to Justice Alito is, if there's a power that the FTC is wielding now that trenches inappropriately, the answer is not to do away with the four cause removal, but to eliminate that power, that individual power, correct? Correct. And an authority that is cited by petitioners and their reply brief bar VAAPC supports that proposition. And so that should be the answer if there's been a difference in the powers or an expansion of the powers inappropriately. That is our position. Yes, the parties have not briefed severability at the merit stage of this case. And in the event that the court wants to reach that question, you might consider either supplemental briefing or remanding to the district court to decide that issue in the first instance. Thank you, counsel. Justice Kagan? Mr. Edgar, well, it seemed to me that when you were talking to Justice Alito, you had more to say about this question of comparative risks and how we should balance the two kinds of risks and what we should be thinking about now. So I wanted to give you a chance to say that, but, and, and within whatever you want to say about that topic, I was wondering if you could comment, a lot of these hypotheticals have been about, you know, what if, what if Congress structured an independent agency like this or like that? I mean, most of these independent agencies, Justice Sotomayor is right that the CFPB was anomalous in this respect, but basically like the vast majority of them all use the exact same structure or if not exact, near exact same structure. There are little variations, but they're all set up with bipartisanship. They're all set up with a chair that, that does have some greater control and that is more controllable by the president. You know, they're all basically set up the same way. So all of these hypotheticals about what if Congress did this, I'm wondering if you could comment in your discussion of comparative risks about how we actually just, why, why it is that we actually have just never seen that. I think it's because the political branches have learned from experience and experience is the great teacher. There's a, an insightful discussion of the history and tradition surrounding traditional independent agencies and the separate opinion in the PHH case that has been cited extensively by the parties and that explains that the structure that the political branches have come up with honors and gives effect to our constitutional values as we explain on the very first page of our brief. We think that the political branches have done a good job of learning. I mean, the political branches, Congress, Congress, which is made up of both Democrats and Republicans who are aware that neither Democrats nor Republicans will control the government forever and are structuring these systems with that in mind. That is, I think that is exactly right. Justice Kagan, that there's an appreciation and an understanding that folks in power today may not be in power tomorrow and you want a structure that will be able to withstand the test of time. The other kind of interesting thing about this is that it's not just Congress. It's Congress acting together with the president every single time. In the case of the FTC Act, the act has been amended time and time and time again since this court's decision and Humphrey's executor. Presidents are signing all of those bills into law. They are supporting the FTC in a myriad of ways. They too have read the Vesting Clause of Article II and they too believe in preserving executive power. It is simply implausible to say that presidents have been supporting these traditional independent agencies now for more than a century and a half and even from the first Congress, George Washington signing into law the Sinking Fund Commission, the Revolutionary War Debts Commission, the Mint Commission. It is absolutely implausible to say for the entirety of American history, presidents of the United States have been complicit in giving up a vital executive power that is, according to petitioners, indispensable to their constitutional duty. The better answer by far is to say that presidents have understood and appreciated that vital interests of the American people can be served by having constraints on the exercise of power. That is a really important part of our constitutional tradition and that is what petitioners are putting at risk.   You mentioned some of the early history and I think I want to give you a little bit of a chance to talk about that because we haven't. When I was a young lawyer and this unitary executive theory really got its start and got its legs, there was a pretty simple version of the history and that drove a lot of the early discussion of the unitary executive, what was wrong with Humphrey's executor. What have the historians been telling us more recently about that sort of early understanding of the history and bring us up to date here a little bit about where the history is with respect to these issues. There is an insightful discussion of this in an essay authored by Professor Nelson that we have cited in our brief and that cites recent historical scholarship and there is also many amicus briefs that have been submitted in this case which basically affirm that there is a rich body of recent including post seal of law historical scholarship that supports the conclusion that the history surrounding this issue is at a minimum contestable and that there is a whole lot of history actually that supports the proposition that the first president of the United States and the first Congress did not believe that the president always and everywhere had to have an absolute, illimitable, indefeasible power to fire every single head of any kind of commission exercising any significant governmental authority. We know that from the first Congress on the Sinking Front Commission, the Revolutionary War Debt Commission, the Mint Commission and I think there are some 10 other commissions for example that are discussed in Professor Norse's amicus brief just by way of example. I think that is another virtue of our position that we are asking the court to give effect not just to the decision of 1789 but also to the decision of 1790. The other side is not doing that. They want you to give a maximalist interpretation to for example the decision of 1789 which we agree settled the question of whether the Senate should be able to interfere with presidential removals but everything else as Professor Nelson explains and many other scholars have ably explained is highly contestable at a minimum. There is actually a lot of historical evidence that goes the other way. That is all the more reason for this court to be cautious in developing heavy-handed constitutional rules that one, don't have a clear basis in constitutional text. We absolutely accept this court's precedents that interpret the Vesting Clause of Article II to establish a general default presidential removal power but it cannot be said the constitutional text clearly delineates the boundaries between the president's power and Congress's power with respect to removal. Then when you add to that a growing body of historical scholarship indicating that original understanding from the time of the first Congress and the first president was that significant governmental authority absolutely could be vested in commissions that were not subject to plenary presidential control, that every single member was not subject to presidential control and in fact in a lot of respects as the scholars have explained, those early commissions were actually substantially more independent than modern day administrative agencies. For some of them, the president couldn't even appoint. He couldn't even decide who would become the commission as for example with respect to the sinking fund commission where you had the chief justice and the vice president were by operation of law installed on those commissions. So those commissions were in a lot of respects much more independent than modern day traditional independent agencies. Mr. Scorsese. I just want to explore just for a brief minute your scintilla of conclusive and preclusive power theory. You agree I assume the president is vested with all the executive power. Yes. You agree that he has a duty to faithfully execute all the laws. Yes. Civil and criminal. We agree that the constitution imposes on the president a duty to faithfully execute the laws. All the laws. Well. Some laws he doesn't have to. That would be news to our friends across the street. The take care clause is a duty and it is also a power but the text of the clause does not provide that the president must have at will presidential. I didn't ask that. Does he have a duty to faithfully execute all the laws? We know from. Yes or no. I would say no in the sense that there's two different questions and I want to make sure that I'm answering the question. The question is does the president have a duty to faithfully execute all the laws? The answer is no. Why? So he can't break the law for sure. For sure. Does he have to be vested with statutory authority to actually enforce directly enforce or to I'm not asking whether he has to bring the indictment. I'm asking whether he has a duty to faithfully execute the laws. I think the president does not under both history and tradition have to have plenary power of supervision but in the case of the FTC he does have some power of supervision including if there's a demonstrable palpable violation of law the president could absolutely fire a commissioner of the FTC under the fine language of the statute. So the answer is no I guess but you say that he does have to has to have direct supervision and removal authority for someone who has conclusive and exclusive authority to bring fine criminal prosecutions right? That is our understanding of this court's decision in Trump the United States. That's your understanding? Yes. But not civil? That's right and to go back and just to be clear so that means if the government wants to bring a misdemeanor that person has to be reportable to the president but if the government wants to bring penalties and injunctions that person doesn't. I don't know the scope of this court's holding in Trump the United States. I'm asking you for your theory because it's a very interesting theory. You're building off of two words from Trump versus the United States and putting a gloss on it that I'm not familiar with. I had understood the executive power and he has conclusive and preclusive authority of that but this line I don't know where it comes from and I'm wondering I'll put my cards on the table. Maybe it's a recognition that Humphrey's executor was poorly reasoned and that there is no such thing in our constitutional order as a fourth branch of government that's quasi-judicial and quasi-legislative. Maybe you're trying to backfill it with a better new theory that itself recognizes that we've got a problem. The theory that we are referring to Justice Gorsuch as we understand it is not just based on this court's recent decision in Trump the United States. It goes all the way back to Marbury v. Madison and Marbury does not use the term conclusive and preclusive but it absolutely says... And neither does Humphrey's. It uses quasi-things. It talks about the distinction between authorities that are vested in the president and the president's powers in the constitutional sense and executive power in the constitutional sense and it actually cites Marbury v. Madison for that proposition. Oh sure, I would hope it would. For that proposition and Marbury itself distinguishes in the context of removability of federal I guess I'm just wondering are we going to get... If we take your theory to backfill Humphrey's and go down this road, how are we supposed to decide which powers are exclusive and preclusive for your purposes as you understand it, not as I understand it from Trump the United States, but as you understand it? What powers are going to fall in and what are going to fall out? Are we going to have just as much litigation over that as anything else we might do in this case? I don't think so. We've had this modern era of traditional independent agencies for a long time. We haven't had any precedent ever striking them down and this court has not been, as far as I know, overwhelmed with difficult questions of line drawing. In fact, from 1935 to 2025, we had pretty much unanimity among courts that traditional independent agencies are fine. To go back to... You haven't had a lot of litigation over Humphrey's and its limits and its boundaries and in SILA law, you invoke it as a great decision. We do invoke SILA law as a great decision. We're always going to have litigation over the separation of powers, aren't we? There will always be litigation, absolutely, but the point is that this court's precedence affirming Congress's authority to work with presidents to create traditional independent agencies has not generated any significant problems, still less insurmountable problems. Thank you. Justice Kavanaugh? Trying to tick through a few questions here. On Justice Alito's questions, you said independent agencies do rulemaking enforcement and some adjudicatory powers as well, but so do the traditional cabinet agencies do all of that too, or at least most of them do. I'm not sure that helps you distinguish the independent agencies from the traditional executive agencies on the earlier questions, but I'll just leave that. You said you agree with... I think you said you agree with all the court's precedence. That includes everything in Myers? We agree with the holding of Myers. Do you agree with the opinion in Myers? No. A lot of the reasoning in Myers went too far, and that was part of what the court decided in Humphreys. On the text of Article II, we haven't talked a lot about the theory by which you get to the other side's position from the text. The first 15 words, the executive power shall be vested in a president of the United States of America. For the president to exercise that power, he needs subordinates, and he needs to be able to supervise and direct the subordinates, and to supervise and direct, he must be able to remove those officers at will. This is the theory. Otherwise, and this is where I want to get your answer to, otherwise the subordinate could ignore the president's supervision and direction without fear, and the president could do nothing about it. You agree that's the implication of your theory, correct? That the subordinate could disregard the president's instruction, and that in some circumstances, the president could do nothing about it. Yes, in some circumstances, but not under the FTC Act in the modern era of traditional independent agencies. If there was anything like malfeasance, if there was neglect of duty, so that would be associated with lawbreaking, as Professor Manners discusses in her amicus brief on the INM standard. But generally, if the president says, I wish you'd prefer, pursue a more aggressive enforcement policy, and the head of the agency says, I'm not going to do that, there's nothing the president can do about that, right? If it's just a matter of enforcement priority, that's right. Well, I would want you to issue a new rule in a particular way that does a particular thing, because I think as president, it would be better for the American people. And the agency head says, I disagree with that. I'm not going to do that. You agree that that's okay under your theory? That is okay under our theory. That's the judgment of Congress and the president. And as was pointed out in Ray Aiken, and as we've explained in our brief, this court's precedents don't stand for the proposition, Justice Kavanaugh, that we have to have those arrangements. They just stand for the proposition that the people's elected representatives in Congress and their democratically elected president in appropriate circumstances can come together and decide that vital interests of the American people, including preservation of liberty, and I don't think we should forget about that, including that can be effectuated by having these multi-member commissions. Two real world questions. You've mentioned many times, you can just go to Congress to fix this. Well, once the power is taken away from the president, it's very hard to get it back in the legislative process, kind of the flip side of what we were talking about in the tariffs case. Because the Congress, the real world of this, is the independent agency shifts power from the presidency to the Congress. Everyone recognizes that. That Congress has more control over the independent agencies than they do over the executive agency. So Congress doesn't want to give that up. It's hard for the president to get new legislation passed that would, for example, convert an independent agency into an executive agency. Do you have an answer to that real, I mean, I think just leave it to Congress, ignores the reality of the legislative process and Congress's desire to keep that power that they have had, that most people have recognized over the independent agencies. That's a theory out there. I just want to get your response to that. Yeah, I have two responses to it. One is that I don't think it's an accurate characterization of what's going on to say that Congress is aggrandizing its own power at the expense of the executive. I think, in fact, exactly the opposite. And a lot of these agencies... That famous quote, the independent agencies are ours by a leading member of Congress, that was just... I will give you an example from the FTC Act itself. The operative provision from the very first version of the act provides that this act is all about defining unfair methods of competition in commerce. Full stop. How do you know what is an unfair method of competition in commerce? The statute doesn't say. It delegates that congressionally, constitutionally enumerated authority to an agency that the president has all kinds of supervision and influence over and what is happening... Much less than the executive agency. I understand your point there. I think I got it. Your brief refers to regulatory stability being a virtue served by the current overarching regime. I don't think a lot of the regulated parties really think stability has been a virtue of the regime because it goes back and forth when the agencies shift power. I think unaccountable instability would be what they might say. Can you address why you think, and this is relevant to the star incisus factors I think, why you think regulatory stability is actually occurring at a lot of these independent agencies? Yeah, absolutely. Two things. One is that part of the logic of that comes from this court's decision just last term in the Chevron case where the court said you can have a lot of regulatory instability if every single time a new administration comes into office all of a sudden everything can change. Now that is a problem on steroids if petitioners get their view because you don't even have to wait for the administration to change. The president could just on a whim decide tomorrow that everything the agency has been doing is wrong. Public reliance on stability presupposes that this is the whole point of the staggered terms requirement that this court explained in detail in Humphrey's executor that the whole point of this structure is to guarantee a modicum of stability that private regulated entities can depend upon and that is jeopardized by at will presidential removal. More quickly, hopefully you've used the phrase chaos and disruption if you lose and don't strike down the entire agency. I think you used that phrase. I don't think that's what would happen if you lost and I think you would agree with what I'm about to say which is if you lose on the merits, the proper remedy is simply to sever the forecaused removal provision not to get rid of the FTC. Do you agree with that? I agree with part of it but not all of it. The remedy is not to get rid of the FTC but I think there's an analytically difficult question about whether the proper remedy would be to sever the forecaused removal provision as opposed to depending on the nature of the ruling maybe one isolated power that is deemed to be quintessentially executive and that generates the separation of powers problem. Okay, last. Sorry about the length of this but this is important. Last, you said Congress as a tradition they won't depart from it but the last 10 years we've seen two examples of first a single headed independent agency and separately a double forecaused removal provision. So I don't think the idea that Congress is just following the model that it's used before is really sustainable in the face of those two experiments that we've seen in the last 10 years. That's just a comment from your point about oh there's a model and they just follow the  It is not an absolute rule and there may be times when the political branches depart from an established model and when they do so in constitutionally problematic ways what we know from recent history is that this court will be there and there will be time enough to decide those questions. All right, thank you for your answers. Justice Barrett. I want to just ask a quick question about history. Justice Kagan was asking you about new scholarship that historians have identified which you say shows that independent agencies have a longer pedigree than maybe some thought originally but do you concede that the first statutory anything that looks like a statutory removal restriction like an inefficiency neglect malfeasance appeared in 1887 with the ICC? I don't know if it's the first to be honest with you Justice Kagan, Justice Barrett I'm sorry but what I would say is that as to the early commissions I think that factor actually cuts the other way because there was no there was no provision authorizing presidential removal for some commissioners. That's our point. You had commissioners like the chief justice and the vice president who were appointed by statute and the president couldn't remove them under any circumstances. But they were two of five and it could remove he had unchallenged authority. To remove the other three who served on that commission and there's silence. I mean they're not there's not the inclusion of statutory removal restrictions. You didn't really see that until the ICC. They were understood at the time to be for the officers like the chief justice and the vice president on the thinking fund commission for example to be completely insulated from presidential removal and it wouldn't make any sense for the president to be able to remove them from the commission. That was not the understanding at the time as has been ably set out by many historians. But here's the bigger point is that those commissions are in a lot of ways much more independent than modern day independent agencies and petitioner's theory is based on the idea that any time these commissions are exercising significant governmental authority every single commission member must be subject to at will presidential removal and in that respect their theory cannot be squared with founding your council. The thinking fund had the secretary of state treasury and the AG and there's no dispute even under your theory that the president could fire those three. So sure the chief justice and the vice president but he could very easily take control over the fund. Also we distinguish that in columns and it seems to me that these early examples had very very limited authority. I mean the mint or the revolutionary war debt commission, there were no statutory removal restrictions and all it did was settle accounts between the United States and individual states after the war. I mean there's nothing that looks like the FTC at the time of Humphreys or certainly not today. You have to concede at least that. Yes and two responses to that. I think it's a fair observation but first for the thinking fund commission for example maybe it didn't wield the broad panoply of authorities of the FTC. That's fair enough but Alexander Hamilton thought that it was absolutely indispensable to the health of the national economy and that this was about managing the public debt and he thought that it would implicate the nation's stability going forward. That's why they thought this governmental function should be vested in this multi-member commission. So it was not something that was deemed to be insignificant by any stretch of the imagination but one more point on the difference between the three members and the two members. We have real world evidence. This is not an abstract thing. We have real world evidence of Chief Justice Jay, I believe it was, who could make the dispositive vote difference in terms of the thinking fund commission of when they make a decision that the president's cabinet supports, when they make a decision that they don't and so the fact that there are some members of the commission who were conceivably not removable at will by the president, that just makes our point that the first president of the United States and the first congress emphatically rejected the constitutional theory on which petitioner's position is predicated. Counsel, let me say, let's say, just assume that I disagree with you about the history. Let's assume that I think, I'll grant you for this purpose that the decision of 1789, if you just took it in isolation, maybe not as conclusive as Myers thought it was, I'll just grant you that for purposes of this question. But let's say that I think the liquidation argument throughout the 19th century shows that by the time of the end of the 19th century, up until we get to the ICC and the emergence of what starts to look like the more modern independent agency, that the government has the better of the argument. But let's say that in 1887, after the ICC and then after the FTC and then after Humphreys when there was more of the explosion of independent agencies, that let's just assume, again for this purpose, that at that point, yes, you do have precedents like Humphreys. Humphreys clearly is a good case for you. Do you still lose? If I think as of 1887, it was liquidated, it was settled, but then we did have cases and congressional practices that veered from that unbroken line. No, we don't lose. We don't lose on the merits and we certainly don't lose on stare decisis. So on the merits, the doctrine of constitutional liquidation by historical practice absolutely can apply based on the last 150 years of history. But counsel, if it had the first, I mean, in the assumptions that I've asked you to make, it was liquidated as of 1887. So you think liquidation can kind of get a new restart, like kickstart in 1887? That is not just my view. That is the view of this court in cases like, I believe, NLRBV, Canning and Chiafalo. And I would also direct the court's attention to United States versus Curtis Wright Export Corporation, where the court said, you have 150 years of historical practice. That's enough. Okay. Justice Jackson. Really quickly on your exchange with Justice Gorsuch, your hesitancy to respond to his take care question, I'm wondering whether that has to do with the fact that prosecutorial discretion exists and that the idea can't be, I think, that the executive has to always enforce all the laws, right? I think that's right. And the very authorities that petitioner cite in the reply brief actually stand for that proposition. In cases like United States v. Texas and the Heckler v. Cheney case, the court went out of its way to expressly and unambiguously affirm Congress's authority to regulate prosecutorial discretion by statute. Let me ask you about Justice Kagan's invitation to expound upon comparative risks. I don't know if we got back to that. But before you do that, let me just also focus in on Justice Kavanaugh's question about losing on the merits and the extent to which the answer would be just striking down the four clause removal protections. I mean, I appreciate that. But doesn't that create pretty significant risks with respect to the missions of the various agencies? I mean, it's not just we don't have four clause removal and the agency continues. That would then, I think, open the door for the president to come in, each new president, and clean house in terms of all of the individuals who are running that agency, notwithstanding their expertise and knowledge and experience and the things that they are doing to promote the mission of the agency. And presumably, the president could install whoever he wanted in those positions. And that, I think, creates risks. So why don't you talk about the comparative risks of your formulation or understanding of the different constitutional dynamics and what the government says should happen in this situation? Sure, there are real-world risks that are palpable that we know can materialize very quickly if petitioners get their way. And think about it in terms of commissions like the Federal Elections Commission. Would anyone want those sensitive election-related determinations to be under the plenary control of a political actor? Think about the Nuclear Regulatory Commission. Can't Congress and the president come together and say those types of technical determinations that could have massive implications for the public in all kinds of ways should be made by a multi-member body of experts? And if there's any kind of problem with the way those commissions are working, they can be changed by the political branches in a heartbeat. And presidents, as far as we know, are not even trying to change them. It's not like they're coming to this court and telling you, we have a big problem. We've been lobbying Congress. And Congress is just, to Justice Kavanaugh's earlier point, they're just not going along with it, and they're not doing the right thing. Presidents are not even trying to go to Congress to get these forecasts removed. Because presidents have accepted that there could be both an understanding of Congress and the presidency that it is in the best interest of the American people to have certain kinds of issues handled by experts who, and I think in your colloquy with Justice Kagan, you identified the fact that these boards are not only experts, but they're also nonpartisan. So the seats are actually distributed in such a way that we are presumably eliminating political influence because we're trying to get to science and data and actual facts related to how these decisions are made. And so the real risk, I think, of allowing these kinds of decisions to be made by the president, of saying everybody can just be removed when I come in, is that we're going to get away from those very important policy considerations. It will get away from those policy considerations, and it will create opportunities for all kinds of problems that Congress and prior presidents wanted to avoid, risks that flow inevitably, just given human nature, the realities of the world that we live in, risks associated with extreme concentrations of power in the hands of one person. Can you talk about the FTC? This is my final question. Why would Congress have thought it important to make this agency in particular independent? I think in large part because Congress had tried and experimented with alternatives in the past. They didn't just do this on a whim. They tried to legislate on their own, and they determined that it was not practicable for Congress to exercise its own constitutionally enumerated authority to regulate commerce by, for example, specifying ex ante all the different things that would constitute unfair methods of competition. So what they wanted was an expert agency that could take on that task, and it would be insulated from political pressure, not just emanating from the president, but emanating from Congress too. Congress is giving away its own power to some extent. Your point is that they were doing something important for the interests of the American people, not with an effort to try to strip the executive of any authority or anything like that, but to fulfill its own Article I obligations to legislate in the best interest of the American people. Absolutely, and in a lot of ways, they're giving the president more power than he had before because the president wouldn't have the authority to determine what are unfair methods of competition all on his own, and that's what will be the practical result of accepting petitioner's theory, that tomorrow you'll have a situation where the president can come in and unilaterally decide. This is a quintessentially lawmaking function. Unilaterally decide what constitutes an unfair method of competition, what constitutes an unfair trade practice. If that was going to be the law, why wouldn't Congress just reserve that power to itself? Thank you. Thank you, counsel. Rebuttal, General Sauer? Thank you, Mr. Chief Justice. Two quick points. On the parade of horribles arguments being made, I think it's very telling that Mr. Agarwal, one of the last things he said is that the FEC has to remain independent, but of course, the FEC does not have statutory removal restrictions, and under Braidwood, the president already has the power to remove the members of the commissioners of the FEC. Therefore, the notion that like this is the end of the world, it's going to change the structure of our government, the lead counter example that's given is one that's already been decided by this court's cases. Justice Barrett, regarding the question of historical liquidation, we think the case that you ought to look at is Powell against McCormick. It's very analogous to the sort of historical, what happened in history here. In that case, Congress, from the time of the founding until the Reconstruction Congress after the Civil War, had interpreted the Constitution to not allow it to refuse to seat a member of Congress other than the reasons that are set forth explicitly in the Constitution, the Qualifications Clause. The Reconstruction Congress changed that and decided not to seat a couple of former members who had too close ties to the Confederacy. After that, for the next 100 years or so, Congress then started exercising that power, not often but intermittently, exercising the power to refuse to seat other members. And this court said in Powell against McCormick, what is decisive there in that point of constitutional interpretation is the liquidation that occurred in the 19th century, not the subsequent, again, very lengthy tenure of practice of Congress refusing to do that. And therefore, it held that Congress lacked the power to refuse to seat the Congressman in that case, meaning that's very, very compelling here. I think it's very telling that in this particular case, early on, Mr. Agarwal said twice that it's within the realm of possibility that Congress could take not sure how many but a significant number of cabinet level agencies and convert them into multi-member agency commissions outside the government's control. How many of them it could do is really a creature of not a question of constitutional question on his view. It's a question of statutory accident, is are there conclusive and preclusive powers in the organic statute theory? If there are, maybe they could be excised. And obviously, the devil's in the details here because of those conclusive and preclusive powers are fairly broad as the colloquy about civil enforcement powers illustrates. If they're fairly broad, then basically, we would win this case and virtually every other case because almost all the agencies, cabinet level or independent agencies are going to have civil enforcement powers in most cases and so forth. But if they're narrow, then we have a situation where Congress could erect, reconstruct virtually the entire executive branch outside the President's control. And that is not even a Republican form of government. But that is the logic of the position that's being advanced here. That is the parade of horribles the court ought to consider and that contrasts dramatically with what, for example, Madison said when he talked about the great principle of unity and responsibility, the chain of dependence that runs from the lowest to the middle grade to the highest to the President and the President is accountable to the community which is the voters. In short, Humphrey's executor is a decaying husk with bold pretensions. It has a powerful hold on the minds of some people within our constitutional system. It certainly seems to have a powerful hold on the minds of lower court decisions. The lower courts and their decisions. The court should overrule Humphrey's executor explicitly and restore the separation of powers to our government. Thank you, counsel. The case is submitted.